E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
ANNAMARTINE SALICK (Cal. Bar No. 309254)
CHRISTINE M. RO (Cal Bar No. 285401)
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
Assistant United States Attorneys
Terrorism and Export Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2400
    Facsimile: (213) 894-0141
    E-mail:   annamartine.salick@usdoj.gov
             christine.ro@usdoj.gov
             kathrynne.seiden@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 23-372-RGK |
|---|---|
| Plaintiff, | MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR REDETERMINATION OF CUSTODY STATUS PURSUANT TO 18 U.S.C. § 3142; DECLARATION OF KATHRYNNE N. SEIDEN |
| v. | |
| WENHENG ZHAO, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Annamartine Salick, Christine M. Ro, and Kathrynne N. Seiden, hereby submits its Memorandum of Points and Authorities in Opposition to Defendant's Motion for Redetermination of Custody Status Pursuant to 18 U.S.C. § 3142.

//

1       This Opposition is based upon the files and records in this

2   case, the Declaration of Kathrynne N. Seiden attached hereto, and

3   such further evidence and argument as the Court may permit.

4   Dated: September 22, 2023      Respectfully submitted,

5                                   E. MARTIN ESTRADA
    United States Attorney

6

7                                   CAMERON L. SCHROEDER
    Assistant United States Attorney
    Chief, National Security Division

8

9                                         /s/

10                                  ANNAMARTINE SALICK
    CHRISTINE M. RO
    KATHRYNNE N. SEIDEN

11                                  Assistant United States Attorneys

12                                  Attorneys for Plaintiff
    UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Until his arrest, defendant was an experienced, active-duty Navy servicemember who held a Secret-level security clearance and received numerous trainings on detecting and reporting suspicious foreign contacts. Nonetheless, for more than two years, defendant routinely used sophisticated, encrypted methods to pass controlled unclassified information to a Chinese intelligence officer ("IO") in exchange for, in defendant's words, "easy money." Having now been indicted for bribery, defendant asks this Court to accept his claim that he is a victim, trust him to comply with the conditions of pretrial release, and reverse the Magistrate Judge's ruling detaining him pending trial. The Court should decline the invitation to gamble matters of national security on the promise of someone who traded in that same security for personal profit. No condition or combination of conditions can reasonably assure the safety of the community or defendant's appearance as required, let alone both. Defendant's motion should be denied.

## II.    THE MAGISTRATE JUDGE DETAINS DEFENDANT PENDING TRIAL

Following a 1.5-hour-long hearing in front of the Honorable Patricia Donahue, the court ordered defendant detained pending trial on the basis that he poses both a significant risk of flight <u>and</u> a danger to the community. (Ex. A ("Hrg. Tr.") at 36–37.) With respect to risk of nonappearance, the court made clear that it had "given great consideration to the significant bond proposed by the defense," but observed that despite his family's "amply evidenced" financial support, defendant still "felt the need to obtain frequent payments over a course of an extensive period[.]" (<u>Id.</u> at 37.) Even if

1    defendant thought he was communicating with a stock investor, the
2    court found defendant's conduct nonetheless clearly violated the
3    "oath he took as an officer." (Id.) Defendant's "cavalier disregard"
4    for that oath gave the court little confidence that defendant would
5    abide by any conditions of release, even those secured by a
6    significant bond package. (Id. at 37-38.)

7         The court also found that that defendant poses a danger to the
8    community. (Id. at 38.) The court explained that even if defendant
9    did not know he was "surreptitiously and continuously transmitting"
10   this information to someone employed by the People's Republic of
11   China ("PRC"), the allegations suggested that defendant was
12   "nonetheless clearly willing" to violate his oath to the USN and send
13   non-public information that was "clearly labeled as not to be
14   disseminated to the public." (Id.) The court noted that such conduct
15   from a member of the military "endangers the national security" of
16   the U.S. (Id.)

17   **III. DEFENDANT SHOULD REMAIN DETAINED PENDING TRIAL**

18        On appeal of a magistrate court's detention ruling, a district
19   court "review[s] the evidence before the magistrate" and determines
20   "whether the magistrate's findings are correct." United States v.
21   Koenig, 912 F.2d 1190, 1192-93 (9th Cir. 1990). Although the district
22   court must make its "own independent determination," it is "not
23   required to start over . . . and proceed as if the magistrate's
24   decision and findings did not exist[.]" (Id.) Here, Judge Donahue's
25   order should remain in place because all four of the relevant factors
26   under 18 U.S.C. § 3142(g) reflect that no combination of conditions
27   will reasonably assure defendant's appearance at trial or, more
28   importantly, the safety of the community. See 18 U.S.C. § 3142(e).

First, the nature and circumstances of the offense charged weigh in favor of detention. For nearly two years, defendant maintained an active relationship with an IO from the PRC. Throughout the duration of that relationship, defendant was an active duty servicemember who received repeated and regular trainings on detecting and reporting suspicious foreign contacts and the proper handling of controlled information. Nevertheless, defendant consistently provided national security information -- information that was marked controlled and that defendant surreptitiously collected -- for "easy money." (Ex. B ("Intvw. Tr.") at 96, 121.) In short, defendant's recklessness, ongoing relationship with the IO, and willingness to betray his country in exchange for a modest personal profit suffices as clear and convincing evidence that defendant poses a danger to the national security of the United States if released.

The Court cannot reasonably assure that stringent bond conditions will prevent that danger. As defendant himself acknowledges, his coconspirator is an agent of a "sophisticated, international, government-sponsored espionage operation." (Mot. at 4.) Defendant communicated with that individual surreptitiously, using encrypted internet-based methods. (Ind. ¶ 17.) In other words, Pretrial Services does not have the capabilities to effectively monitor defendant to ensure that he ceases the highly dangerous conduct for which he is charged. And while the government has removed defendant's access to new materials, it cannot prevent defendant from disclosing sensitive information learned from his service or from using sophisticated, technical means developed to avoid detection.

Moreover, defendant's claim that he is the unwitting "victim" of a sophisticated foreign operative is belied by defendant's conduct

3

1 and admissions. In his post-arrest, <u>Mirandized</u> statement, defendant
2 conceded that he had received training on recognizing suspicious
3 contacts from people overseas. (Intvw. Tr. at 62-63, 99.) Defendant
4 further admitted that he knew the IO lived in China and that, even
5 early in the relationship, defendant found the IO's conduct to be
6 "fishy." (<u>Id.</u> at 17, 87, 96-97, 102, 122.) And when the IO asked him
7 for classified information, defendant admitted that he thought he
8 would look like a "spy" if he sent it. (<u>Id.</u> at 103.) Despite all
9 this, defendant did not report the IO or cease communication. Rather,
10 as defendant stated: "I mean, he's paying me so I was like, okay,
11 I'll just do whatever he says." (<u>Id.</u> at 32.) In other words,
12 defendant remained willfully blind to the dangerousness of his own
13 conduct. Whether or not he knew he was communicating with an IO,
14 defendant knowingly violated his official duties by disclosing
15 controlled information to a person he knew was not authorized to
16 receive it. In short, defendant's claim that he was unknowingly
17 victimized is specious and is further demonstrative of why the Court
18 cannot trust defendant's word that he no longer poses a danger and
19 will appear as required.

20     <u>Second</u>, the weight of the evidence weighs in favor of detention.
21 As outlined in the indictment, the government identified many
22 documents defendant passed to the IO in violation of his official
23 duties and defendant admitted to his conduct in a <u>Mirandized</u>
24 statement. Given that the evidence here is strong and a criminal
25 conviction and prison sentence are likely, defendant has a strong
26 incentive not to appear.

27     <u>Third</u>, although defendant has no significant criminal history,
28 his personal characteristics make him unsuitable for pretrial release

because defendant has the means, incentive, and reckless disposition to flee. Defendant has significant contacts in the PRC. In addition to the IO, defendant has family members living in China, including a family member whose identity he impersonated to receive the bribe payments from the IO. (Id. at 126-27.) At one of the two homes defendant is offering as part of his bond package, his parents rent out space to friends from their village in the PRC. (Hrg. Tr. at 5.) When defendant was arrested, he had $20,000 in cash and had recently searched for one-way flights to Taipei for August 7, 2023. (August 3, 2023 USPO Report at 4-5.) Defendant researched that flight after suspecting that law enforcement had searched his phone. (Intv. Tr. at 103-04.) And according to the USN, defendant and his wife had requested leave, beginning on August 8, 2023, to travel to Wisconsin, not overseas. (USPO Report at 4-5.) Whether defendant actually purchased a flight to Wisconsin or the money came from family members, defendant has easy access to cash and the means to flee. Taken in tandem, these facts demonstrate by a preponderance of evidence that defendant is at risk of not appearing and that if he flees, he is unlikely to come back. Moreover, pretrial release depends on the Court putting its trust in defendant and in defendant taking seriously that trust. As Judge Donahue observed, defendant adopted a "cavalier" attitude towards his military oath, trading on it for just a few thousand dollars. Thus, defendant's characteristics weigh in favor of detention.

Finally, it is difficult to overstate the seriousness of the danger it would pose if defendant continued anything approximating the conduct for which he is charged. Therefore, defendant's motion should be denied, and he should remain detained pending trial.

<u>DECLARATION OF KATHRYNNE N. SEIDEN</u>

I, Kathrynne N. Seiden, declare as follows:

1.    I am an Assistant United States Attorney in the United States Attorney's Office for the Central District of California. I am one of the attorneys assigned to represent the government in this case.

2.    On August 8, 2023, the Honorable Patricia Donahue held a detention hearing in this case. (Dkts. 14-15.) Attached as **Exhibit A** is a transcript of the detention hearing. (Dkt. 30.)

3.    On August 2, 2023, law enforcement officers interviewed Wenheng Zhao, the defendant in this case. Attached as **Exhibit B** is a draft transcript of the interview.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on September 22, 2023.

*/s/ Kathrynne N. Seiden*
Kathrynne N. Seiden

# Exhibit A

```
                    UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
                  (WESTERN DIVISION - LOS ANGELES)



UNITED STATES OF AMERICA,     )   CASE NO: 2:23-cr-00372-RGK-1
                              )
              Plaintiff,      )           CRIMINAL
                              )
      vs.                     )     Los Angeles, California
                              )
WENHENG ZHAO,                 )     Tuesday, August 8, 2023
                              )
              Defendant.      )    (10:34 a.m. to 11:54 a.m.)
```

DETENTION HEARING

BEFORE THE HONORABLE PATRICIA DONAHUE,
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES</u>:

```
For Plaintiff:          AUSA KATHRYNNE SEIDEN
                        U.S. Attorney's Office
                        312 N. Spring Street, 12th Floor
                        Los Angeles, CA 90012

For Defendant:          AFPD RICHARD D. GOLDMAN
                        Federal Public Defender's Office
                        321 East 2nd Street
                        Los Angeles, CA 90012

Deputy Clerk:           Alma Felix

Court Reporter:         Recorded; CourtSmart

Courtroom Deputy:       Isabel Martinez

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 8365
                        Corpus Christi, TX 78468
                        361 949-2988
```

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

1      **Los Angeles, California; Tuesday, August 8, 2023; 10:34 a.m.**

2                              --oOo--

3              **THE CLERK:**  Calling Case Number CR-23-372-RGK, *United*

4      *States of America versus Wenheng Zhao*.

5              Beginning with Plaintiff's counsel, please state your

6      appearance for the record.

7              **MS. SEIDEN:**  Good morning, Your Honor.  Kathrynne

8      Seiden on behalf of the United States.

9              **MR. GOLDMAN:**  Good morning, Your Honor.  Richard

10     Goldman on behalf of Wenheng Zhao who's present before the

11     Court in custody.

12             Your Honor, before we proceed, may I ask the Court to

13     have the marshals uncuff Mr. Zhao for this proceeding?

14             **THE COURT:**  Let me ask what the marshal's position is

15     on that.

16             **THE MARSHAL:**  It can be done, Your Honor.

17             **THE COURT:**  Is that acceptable to the marshals?

18             THE MARSHAL:  Yes, Your Honor, if you order it.

19             **THE COURT:**  All right.  Yes then go ahead.  Thank

20     you.

21         **(Pause; Defendant uncuffed)**

22             **THE CLERK:**  Please be seated.

23         **(Pause)**

24             **THE COURT:**  We're here this morning for the Detention

25     Hearing which was continued to today at the request of the

1    Defense.

2             I have received and reviewed, obviously, the Original

3    Pretrial Services Report, dated August 3rd, and I've also

4    received and reviewed the Updated Report, dated today,

5    August 8 of 2023.  And I have also just received and have not

6    yet read what appear to be three pages of a transcript of an

7    interview that I understand the Government is proffering in

8    support of the request for detention.

9             Counsel, is that correct?

10            **MS. SEIDEN:**  Yes, Your Honor.  I believe it was a

11   four-page excerpt from the interview transcript.

12            **THE COURT:**  Oh, you're right.  I have pages 124

13   through 127.

14            All right.  And the Government is proffering this

15   transcript in support of the detention request; is that

16   correct?

17            **MS. SEIDEN:**  Yes, Your Honor.

18            **THE COURT:**  Has it been provided to Defense Counsel?

19            **MS. SEIDEN:**  Yes, Your Honor.

20            **THE COURT:**  All right.  Mr. Goldman, have you had an

21   opportunity to review this transcript that the Government is

22   proffering?

23            **MR. GOLDMAN:**  I have, Your Honor.

24            **THE COURT:**  All right.  And does the Defense accept

25   the proffer?

1          **MR. GOLDMAN:**  We do, just perhaps not the argument

2     that's following the proffer.

3          **THE COURT:**  Right, of course.  All right.  Then I

4     will hear argument first from the Government.

5          Let me just be clear.

6          The Government is proffering the indictment, the

7     Initial Pretrial Services Report and Recommendation, the

8     Updated Pretrial Services Report and the transcript that was

9     submitted to the Court this morning.  Is that correct?

10         **MS. SEIDEN:**  Correct, Your Honor, but of course not

11    the Pretrial Services' recommendation.

12         **THE COURT:**  All right.  And is the Government

13    proffering anything else in support of the detention request?

14         **MS. SEIDEN:**  No, Your Honor.

15         **THE COURT:**  All right.  Then I'll hear agreement.

16         **MS. SEIDEN:**  May I take the lectern, Your Honor?

17         **THE COURT:**  Yes.

18         **MS. SEIDEN:**  Thank you, Your Honor.

19         There are no conditions or combination of conditions

20    that will reasonably assure Defendant's appearance; or more

21    importantly, the public's safety in this case.

22         As to flight risk, Your Honor, these are serious

23    charges with serious sentencing exposure.

24         Defendant admitted in a mirandized post-arrest

25    interview that he accepted money in exchange for sending

 1   information related to our national defense.  So there is a

 2   very significant chance that he is looking at prison time and

 3   that gives him, as the Court knows, a very significant

 4   incentive not to appear.

 5          He also has the means to flee, Your Honor.

 6          He has serious ties to the PRC.  He has been

 7   maintaining an active relationship with a Chinese intelligence

 8   officer for the last two years.

 9          He has family members in the PRC.  His parents are

10   currently renting out space in the home that he owns, just

11   blocks from where he would presumably be living, to friends and

12   people from their village in the PRC which is what they relayed

13   to the IRS in their interview.

14          During Defendant's post-arrest interview, he

15   explained that he used a Chinese identification belonging to

16   his cousin to set up a payment platform account, and that is

17   what's contained in the transcript excerpt Your Honor has.  So

18   that's not only indicative of his international ties but also

19   signifies, in addition to the charged conduct, another level of

20   deception that would make it difficult to monitor him on

21   Pretrial release.

22          He also has additional means to flee.

23          He had $20,000 in cash in the van in which he lives

24   on base when that van was searched incident to his arrest.

25   Obviously, that cash has been seized but his longstanding

6

1    relationship with a powerful and sophisticated contact in the

2    PRC suggests that there is more where that came from.

3         Further, during a search of his phone following his

4    arrest, law enforcement found a search for a one-way flight

5    from Los Angeles International to Taipei on August 7th, 2023.

6    And both Defendant and his wife requested leave from the

7    military, beginning on August 8th to go to Wisconsin, not

8    Taipei.

9         So I understand, Your Honor, that this is a very

10   significant bond package that is being offered and that it is a

11   rare case where I would stand here and argue that that is not

12   sufficient to allay the concerns but I think this is that rare

13   case.

14        The house here is not sufficient.  His parents live

15   there and pay him rent but it is his own home.  It's not his

16   parents' home; it's not a home owned by his children or by

17   close friends, it's his, as is the other home that he is

18   receiving income from that he is not reporting.

19        He's already demonstrated that he's willing to sell

20   out his country for $14,000, which suggests a level of

21   recklessness, and that concern is just not sufficiently allayed

22   by a stake in his house, his property.

23        And finally, Your Honor, successful Pretrial

24   supervision depends on his ability and desire to comply with

25   Pretrial Services and with the Court and with the Court's

ability to trust him.  This Defendant swore an oath to faithful

discharge his duty as a member of the United States Navy.  He

knew his duties.  He had security clearance up to the secret

level and he violated all of that for $14,000.  His conduct

makes clear that he is not someone who can be put in a position

of trust by this Court.  He had no respect whatsoever for his

position and he's not going to respect the Court or faithfully

comply with the conditions of Pretrial release.  So all of that

goes to the risk of nonappearance, Your Honor.

As to danger, which is frankly not mentioned in any

depth in Pretrial Services' recommendation which discusses his

substance abuse, but that of course is not the concern here.

Even if his properties could alleviate the concerns about the

risk of nonappearance, they cannot do so for danger here.

The conduct underpinning the charges involves

Defendant sending sensitive military information to an

intelligence officer from the PRC.

In exchange for money, he surreptitiously recorded

and then transmitted military information, photographs and

videos.

He sent the IO nonpublic and controlled operation

plans for United States military exercises in the Indo-Pacific,

detailing specific locations and timing of naval force

movements, amphibious landings and maritime operations.

He photographed electrical diagrams for our radar

8

1  systems stationed on a U.S. military base in Okinawa, Japan.

2     He obtained and transmitted details about the navy's

3  operational security at the naval base in Ventura County and on

4  San Clemente Island, including photographs and videos.

5     In short, he took numerous actions which jeopardized

6  the national security of the United States.  So obviously the

7  Court should not punish him for that conduct at this stage, but

8  the seriousness and the dangerousness of that conduct

9  underscores the danger he poses if he is permitted the

10  opportunity to carry on that conduct.  We can take documents

11  out of his hands, Your Honor, and we can restrict his access to

12  new information, but by virtue of his tenure with the United

13  States Navy and the clearance status that he held, he has

14  additional information in his head that we cannot take out of

15  there, we cannot restrict his access to.

16     Moreover, he's experienced in surreptitious methods

17  of communication.  He used encrypted messages to communicate

18  with this intelligence officer, and it would be very difficult

19  for this court, through Pretrial Services, to supervise his

20  communications and ensure that no additional harm is occurring.

21  So we're not just talking about danger to the Central District

22  of California or risk to the local community, we're talking

23  about danger to our national security, Your Honor, and there is

24  clear and convincing evidence that this Defendant poses such a

25  danger.  And that danger is serious enough and grave enough

9

1    that it is not -- cannot and should not hinge on a house in

2    Monterrey Park.

3           Thank you, Your Honor.

4           **THE COURT:**  Counsel, I have just a couple of

5    questions.

6           The Defendant is charged in an indictment with a

7    conspiracy and receiving a bribe by a public official; along,

8    obviously, with forfeiture allegations.

9           What are the maximum penalties for those violations?

10          **MS. SEIDEN:**  I believe it's 20 years, Your Honor.

11          **THE COURT:**  All right.  And then the Pretrial

12    Services Report, dated August 3rd, states the NCIS agent

13    reported:

14              "The Defendant admitted to sending information to a

15              foreign intelligence officer because it was,

16              (quote/unquote,) 'easy money'."

17           Is that contained in the part of the transcript that

18    was submitted this morning, or is that a different interview?

19          **MS. SEIDEN:**  No, Your Honor, it's the same interview.

20    I just added the portion of the interview transcript to

21    supplement facts that were relayed to Pretrial Services but did

22    not make it into the report that I think are important for the

23    Court to know and consider.

24          **THE COURT:**  All right.  All right, thank you.  Those

25    are my questions for now.

1          **MS. SEIDEN:**  Thank you.

2          **THE COURT:**  All right.  I'll hear from the Defense.

3          **MR. GOLDMAN:**  Thank you, Your Honor.

4          Your Honor, I think at the outset it's important to

5    know what Mr. Zhao is charged with and what he is not charged

6    with.

7          He's not charged in this indictment with espionage.

8    He is charged with bribery ,which is a far different charge

9    than espionage.  And so one of the questions that the Court

10   asked the Government was, "What is the maximum charge that

11   Mr. Zhao faces?"  The Government answered correctly.  The

12   maximum charge for the 371 conspiracy is five years.  The

13   maximum charge for the bribery is 15 years.

14         But what the Court didn't ask and what the Government

15   didn't provide is, what is the guideline calculation based on

16   an analysis of the facts in this case?  And I did a guideline

17   calculation, Your Honor, and I'm going to hand a copy to the

18   prosecution just of the specific sentencing, U.S. Sentencing

19   Guideline provision.  I'd like to hand that up to the Court.

20   And I'd like to inform the Court that the guidelines are as

21   follows in this case:

22         Looking at the calculation of the guidelines in the

23   most punitive way against Mr. Zhao, if he's convicted, the

24   Offense Level is 18, Mr. Zhao has a Criminal History

25   Category of 1 -- meaning he has no prior criminal record at all

1    -- and the Guideline Calculation is 27 to 33 months.

2         If this case would result in him going to trial and

3    being found guilty, that is the guideline range, not 15 years

4    in prison, not 20 years in prison, but a guideline range of 27

5    to 33 months.

6         If this case resolves in a different manner and there

7    was acceptance of responsibility in this case, there's a

8    three-level reduction, as the Court knows, and now the

9    Guideline Range is 18 to 24 months.  So the picture painted by

10   the prosecution with respect to what Mr. Zhao is facing was not

11   a complete picture.  Not a complete picture at all.  And as

12   Your Honor knows, this is not a case involving a mandatory

13   minimum penalty at all.

14        And so the next thing that I want to discuss with the

15   Court deals with the Bail Reform Act and the prosecution's

16   request for detention.

17        As Your Honor knows, this is a case that does not

18   involve any of the enumerated crimes that invokes a rebuttable

19   presumption whereby we have the burden to show by clear and

20   convincing evidence that he's neither a risk of flight nor a

21   threat to the community.  The burden's upon the Government to

22   show by clear and convincing evidence that he cannot be given

23   bond conditions that will reasonably assure his appearance and

24   cannot be given bond conditions that would reasonably assure

25   the safety of the community.  And so I think it's important,

12

1    Your Honor, to look at what the Bail Reform Act says.

2           The Bail Reform Act under 18, United States Code,

3    3142(f) says that a Defendant accused of a crime shall be

4    released either on personal recognizance or on an unsecured

5    appearance bond.  And it is only after the Court makes a

6    determination, based on the prosecution's burden, that those

7    conditions of release -- an unsecured appearance bond or a

8    personal recognizance bond -- will not reasonably assure his

9    appearance in court, then the Court can move to additional

10   conditions.

11          Now, there are 14 conditions that are listed and they

12   increase in order of severity.  It is only until the 11th

13   condition is released, whereby the Court can demand that

14   sureties be posted in the form of money, in the form of

15   property.  So those become the more restrictive conditions.

16   But prior to the 11th condition listed in 3142, the Court is

17   essentially told by the Bail Reform Act that it should look for

18   the least restrictive condition that reasonably assures

19   Mr. Zhao's appearance.

20          Now, as I previously mentioned, we know that he has

21   no prior criminal record.

22          We know that there is no substance abuse issue.  When

23   the prosecution spoke about a substance abuse issue, I believe

24   that the first Pretrial Services Report indicated he drank

25   alcohol once a month.  Somehow I don't view that as a substance

13

1    abuse issue and so I'm not really sure where the prosecutor was

2    going with the argument that there were substance abuse issues.

3               As I said, Your Honor, the Bail Reform Act indicates

4    that the first thing the Court needs to look at is, can

5    Mr. Zhao be released on personal recognizance or on an

6    unsecured bond?

7               The prosecutor brought up allegations contained in

8    the indictment and I wanted to discuss some of those

9    allegations.

10              Does Your Honor have a copy of the indictment in

11   front of you?

12              **THE COURT:**  I do and I've read it.

13              **MR. GOLDMAN:**  Thank you, Your Honor.

14              One of the things that the indictment does not allege

15   is that Mr. Zhao knew that the person he was dealing with was

16   an agent of the People's Republic of China.  There's a complete

17   absence of that allegation.  And in fact, if Your Honor looks

18   at Overt Act Number 5, which is found on page 7, beginning on

19   line 20, there is an indication, based on the prosecution's

20   allegation, that Mr. Zhao thinks he's dealing with someone with

21   respect to investment declarations.  That is what the

22   prosecution says in its -- in its indictment against Mr. Zhao,

23   not anywhere in here that Mr. Zhao knew that the person,

24   unnamed Coconspirator A, was an agent of the People's Republic

25   of China.

14

1          With respect to photographs that were taken -- and

2     specifically, Your Honor, what I want to refer to is Overt Act

3     Number 9, which is found on page 8, line 8.

4          There's no indication in the prosecution's allegation

5     that these photographs were transmitted to Coconspirator A.  It

6     merely states that photographs were taken.  Now, I don't know

7     if they were taken in connection with Mr. Zhao's job as a CB.

8     I don't know if they were sent to Coconspirator A.  But that is

9     absent in the prosecution's allegation in Overt Act Number 9.

10          One of the things that I think it's important for the

11     Court to consider has to do with the analysis of Overt Acts

12     1 through 5 when they are talking about -- "they," meaning the

13     Government -- is talking about a largescale military exercise.

14     And frankly it's a global exercise.  What the prosecution's

15     talking about is exercises in the Indo-Pacific region.  Your

16     Honor, that information was available on a United States Navy

17     website, accessible by the public, during the time of the

18     exercise happening.  Accessible.  I looked at it yesterday.  I

19     went on Google, I punched in "largescale exercise, August

20     2021," and up popped a plethora of information from the United

21     States Navy.  So this is no secret.  This is information that

22     is readily available.

23          I took the opportunity, Your Honor, to compile

24     exhibits.  And if I may hand those up to the Court -- with

25     respect to what is readily available on the website.

1          Your Honor, essentially, if I may proceed, Exhibit 1

2    is essentially a Table of Contents of the various articles that

3    are listed on the U.S. Naval website and then it continues.

4    Exhibit 2:  "U.S. Navy kicks off largescale exercise, 2021."

5    And the following articles are all articles around that time

6    period that are readily available to the public.  So the idea

7    that somehow this information is supersecret is contradicted by

8    the availability of the U.S. Navy's own website detailing all

9    of these different activities in connection with a largescale

10   exercise.

11         **THE COURT:**  Mr. Goldman, obviously I haven't read all

12   of the -- appears to be 11 exhibits in the binder that you just

13   handed me -- but the Overt Act Number 1 in the indictment

14   states that:

15             "Coconspirator A asked for the specific plan and

16             details regarding the locations and timing of U.S.

17             Naval Force movements and information about various

18             military topics; such as, among other things,

19             amphibious landing, distributed maritime operations

20             and logistic support."

21         Is the Defense proffering that all of this

22   information, which is listed in Overt Act Number 1, is

23   contained in these exhibits?

24         **MR. GOLDMAN:**  Your Honor, obviously as the Court

25   knows, this matter first came on for an initial appearance on

16

1    August the 3rd.

2         **THE COURT:**  Right.

3         **MR. GOLDMAN:**  That was when the Court handed down

4    Judge Klausner's standing discovery order for the Government to

5    provide discovery within a two-week period of time.  I haven't

6    gotten discovery yet, that's something I'm sure that the

7    Government's going to provide.  So I can't tell the Court what

8    the specifics are because I don't have the discovery.

9         What I can tell the Court is that if you look at the

10   titles of these articles, these are fairly specific articles

11   about information about these largescale exercises.  Can I say

12   to the Court that there was additional information provided by

13   Mr. Zhao?  I don't know.  But what I can say is that during the

14   dates of these exercises, and before they commenced, all this

15   stuff is available on the U.S. Navy website.  Other than that,

16   I can't really opine further, Your Honor.

17        I think it's important, Your Honor, to consider who

18   is before this Court in determining whether the prosecution has

19   proven by clear and convincing evidence that Mr. Zhao is a risk

20   of flight and a threat to the community.

21        He has been in the United States since 2009.  He is a

22   United States citizen.  He does not hold dual citizenship with

23   the People's Republic of China.

24        His parents, who are in the courtroom, his father is

25   in the back.  His father is also a citizen of the United States

17

1    of America.

2            His mother, who is present, she has a green card.

3    The green card was just renewed last year.  It is good for

4    another nine years.

5            His wife is present in the courtroom.  His wife also

6    works for the navy.  His wife is a naturalized U.S. citizen.

7            In addition, Your Honor, the Court has information in

8    the Pretrial Services Report regarding Mr. Zhao's cousin, Phang

9    Yu (phonetic), who is an honorably discharged naval veteran who

10   just finished nursing school who lives in Dallas, who came here

11   in her cousin's time of need to give assistance to him, and has

12   also said that she would act as a surety.  So clearly there are

13   strong ties to the community.

14           In addition to his mother, his father, his wife, his

15   cousin, he also has two brothers who were born in this country,

16   who are United States citizens.  Does Mr. Zhao have family in

17   China?  Well yes, he was born there.  But I'm not sure the fact

18   of having family in China from a country that you were born in,

19   somehow allows us to reach the conclusion that he's a risk of

20   flight.

21           His passport was seized.  And actually there were two

22   passports.  One passport was a military passport that allowed

23   him to travel in connection with the military.  The second

24   passport is a United States passport.  Both of those passports

25   were seized.  He filed a passport declaration at his initial

1    appearance stating that he would not seek to get a passport.

2    So he's here and he's not going back.

3         Now, the prosecutor said, well Mr. Zhao looked into

4    the idea of a one-way ticket to Taiwan, to Taipei.  One, he

5    didn't buy a ticket to Taipei.  Two, the last time I checked,

6    Taiwan is not an ally of the People's Republic of China.

7    Taiwan is an ally of the United States.  So if somehow Mr. Zhao

8    flees the country and goes to Taiwan, I don't think that

9    there's an issue with him being extradited from Taiwan.  So I

10   think that is a red herring because there's no indication that

11   he made steps to flee, other than to look at a ticket.  So I'd

12   ask the Court to discount the prosecution's conclusion that

13   that indicates that he's a risk of flight.

14        In terms of the information that the prosecution says

15   Mr. Zhao gave, as I pointed out, in the Overt Act Number 5 --

16   excuse me -- in Overt Act Number 9 regarding photographs,

17   there's no indication that those photographs were ever sent.

18   And again, Your Honor, this information that we are talking

19   about is the lowest level of information.  And so I'm not

20   really sure how we can conclude that he presents a risk to the

21   United States if he's released from custody.

22        The Pretrial Services Report indicates that were the

23   Court to release him, he is to rejoin the navy.  Perhaps not in

24   the same position that he was in before, but the initial

25   preserve -- Preservices [sic] reports says he will come back

1  to the navy in a different position.  And I don't know what

2  that means but obviously they have said he's coming back to the

3  navy and there's a place for him.

4        So based upon his ties to the community, based upon

5  his family agreeing to post property; and his wife, his cousin,

6  his father, they're all United States citizens.  They're not

7  going back to China.  They are here saying, we will stand

8  behind Mr. Zhao, we will sign unjustified surety bonds, we will

9  post property, we will do what we have to do.  I think that in

10 light of the fact that what he's charged with is not a

11 mandatory minimum offense, is not an enumerated offense under

12 any of the enumerated defenses listed in the Bail Reform Act.

13 The fact that the guideline range in this case is so low, I

14 think that there are conditions to be fashioned that will

15 reasonably assure his appearance.  And I would ask this Court

16 to follow the recommendation of Pretrial Services.

17        And based on that I'd submit, Your Honor.  And if the

18 Court has any other questions, I'm happy to respond.

19        **THE COURT:**  I do have questions.

20        You mentioned that search on his phone.  The search

21 showed -- revealed an image of a search indicating a one-way

22 flight to Taipei for August 7, which was yesterday so shortly

23 around the time that he was arrested.  And he apparently was

24 residing in a Sprinter van and had $20,000 in cash in a grocery

25 bag.  And had submitted to the navy, by a leave request, to go

20

1  not to Taiwan but to Wisconsin.  Those facts on their face,

2  suggest that he planned to leave the district.

3          **MR. GOLDMAN:**  So let me address the issue with

4  respect to the Sprinter van.

5          Obviously the Court knows there are two homes.

6  They're --

7          **THE COURT:**  Yes.

8          **MR. GOLDMAN:**  -- They're both in Monterrey Park.  He

9  and his wife live on base in the Sprinter van.  That way he is

10  there, he can go to his duties, he doesn't have to travel from

11  Monterrey Park to -- to Port Hueneme in order to complete his

12  duties in connection with the navy.

13         With respect to the money in this case, Your Honor,

14  you know, people have different ways of dealing with money.  I

15  have no idea where this money is from.  The Government has made

16  an allegation that he has received less than $15,000 in this

17  case, and no more than that, Your Honor, so I don't know if

18  that money was connected with monies he received for what he

19  might believe to be information related to investment.

20         And the reason I say that -- again, I want to

21  underscore Overt Act Number 5, specifically lines 20 through

22  24, involving investment decisions.

23         There is nothing in the prosecution's indictment

24  which indicates that Mr. Zhao knew that the person he was

25  dealing with was a representative of the People's Republic of

China.

In terms of the search on his phone of a flight to Taiwan, there's no indication that he bought a ticket. There is an indication that he made a search and nothing more than that. And again, Your Honor, I think the Court's concerns can be allayed by the fact that you have United States citizens who are willing to act as sureties, there is property that can be posted.

One of the things that I didn't address that the prosecution brought up was this interview with the agent talking about WeChat and using his cousin's identification in order to get money or goods or to buy goods from China and apparently you have to have Chinese citizenship. If you read the entire -- the entire interview, you have to have Chinese citizenship in order to have WeChat.

And if the Court will look on page 127, at the bottom of 127, beginning on line 19, for the reason why Mr. Zhao would use his cousin's WeChat, it's right there, because we order -- we order stuff from AliExpress. I don't know if you've heard about it. It's like eBay but it's in China. And with AliExpress, you can't pay with WeChat, we have to use Alipay. So -- so you transfer from the WeChat account and then it ends. But that's the reason that he has given the agent in this case, not for some nefarious purpose. For an entrepreneurial purpose, we want to order goods from China and be able to sell

22

1    those goods in the United States from an Internet vendor.

2           So again, when the prosecution brought this up, I

3    read the whole transcript and I thought, well, here's

4    Mr. Zhao's reason why he would want to use ID belonging to his

5    cousin because he can't order products because he doesn't have

6    Chinese citizenship.

7           Your Honor, have I addressed all of the Court's

8    questions or are there more?

9           **THE COURT:**  Can you clarify which property the

10   Defense is offering to support the bond?  The Pretrial Services

11   Report lists the property at West Emerson, which appears to be

12   owned by the Defendant's parents.

13          **MR. GOLDMAN:** So Your Honor --

14          **THE COURT:**  But there's also a property on North

15   Chandler as to which the Defendant states he is the sole owner.

16          **MR. GOLDMAN:**  Mr. Zhao -- both of these properties

17   are in Mr. Zhao's name.  One property is owned free and clear.

18   I believe --

19          May I have a moment, Your Honor?

20          **THE COURT:**  Certainly.

21      **(Pause)**

22          **MR. GOLDMAN:** Your Honor, one home is owned and paid

23   in full by Mr. Zhao.  The other home is --

24          **THE COURT:**  That's the North Chandler home.

25          **MR. GOLDMAN:**  I believe so.

23

1           **THE COURT:**  The one that's owned and paid in full,

2  right?

3           **MR. GOLDMAN:**  And the other home is owned jointly

4  with Mr. -- Mr. Henders -- excuse me -- Mr. Zhao and his wife.

5  So they own that home jointly.  And either of those homes could

6  be used, could be deposited in the court registry.

7           Your Honor, I wanted to come back to the issue with

8  respect to the trip that the prosecution brought up in terms of

9  the search to a flight to Taipei.  In fact, Your Honor, I

10  believe that he and his wife both purchased tickets for a

11  flight to Wisconsin.  His wife's mother lives in Wisconsin.  So

12  I think those were purchased for that.

13           So what the prosecution is attempting to do is say,

14  Judge Donahue, because Mr. Zhao looked up a flight to Taipei,

15  therefore it indicates that he is a flight risk; when in fact,

16  all he did was look it up; when in fact, tickets were purchased

17  by Mr. Zhao and his wife -- or for Mr. Zhao and his wife to go

18  to Wisconsin to see her mother.

19           **THE COURT:**  Yes.  According to the Pretrial Services

20  Report, he -- the search was for a flight to Taipei,

21  specifically for August 7.

22           **MR. GOLDMAN:**  Okay.

23           **THE COURT:**  All right.  All right.  And with regard

24  to the properties, did I hear you say that either property is

25  offered in support of the bond?  Is that correct?

1        **MR. GOLDMAN:**  Whatever property the Court thinks is

2   appropriate.

3        **THE COURT:**  Okay.  All right.  That's all my

4   questions for now.  Thank you, Mr. Goldman.

5        **MR. GOLDMAN:**  Thank you, Your Honor.

6        **THE COURT:**  All right.  I'll hear response from the

7   Government.

8        **MS. SEIDEN:**  Thank you, Your Honor.

9        First of all, Mr. Goldman mentioned the guideline

10  calculations and the fact that this is just a bribery case.  I

11  think as the Court knows, this is not a run-of-the-mill bribery

12  case.  This is not somebody accepting payment in exchange for a

13  violation of duties in the sense that we typically see in these

14  cases.  This is an exchange, again, for national defense

15  information.  And that guideline calculation which we just

16  heard does not account for the specific underlying conduct, any

17  adjustments, any specific offense characteristics that may come

18  into play.  And even assuming that that guideline calculation

19  is the correct calculation and there are no other factors that

20  are coming into play, several years in prison is still an

21  incentive for somebody to not appear, Your Honor.

22       Further, Mr. Goldman mentioned my point about

23  substance abuse which I fear I may have miscommunicated.  My

24  point was not that -- to imply that Defendant has a substance

25  abuse issue, it was that the only mention of danger in Pretrial

1   Services' recommendation is about the fact that Defendant does

2   not have any substance abuse issues.  And the Government's

3   point is that substance abuse really isn't at the crux of what

4   makes this Defendant dangerous, it is the access to and

5   knowledge of the navy operations, and national defense

6   information, and his willingness to turn that over blindly.

7           Beyond that, Your Honor, there are additional

8   components of Defendant's interview transcript that I have not

9   provided to Defense Counsel because I did not know that he

10  would raise the point he just did.  (inaudible) I'm happy to

11  provide to Defense Counsel and the Court if the Court is not

12  inclined to allow an attorney proffer as to what they said.

13          But in that interview, the Defendant specifically

14  said that he knew that the IO resided in China.  He knew that

15  it was suspicious, and that he had been trained to detect these

16  kinds of contacts.  And I'm happy to provide those excerpts to

17  Defense Counsel and the Court if the Court would like to see

18  them.

19          So Mr. Goldman is correct that there are not

20  allegations in the indictment that Defendant knew this was an

21  IO, but there are allegations and there are facts by virtue of

22  Defendant's own admissions in his mirandized statement, that he

23  absolutely knew that this was suspicious and that he was

24  providing defense information to someone residing in the PRC.

25          **THE COURT:**  Counsel, if you have those portions of

26

1    the transcript available, and copies obviously for Counsel and

2    the Court, can you please provide them?

3         **MS. SEIDEN:**  Yes, Your Honor.  I don't have physical

4    copies but I can make excerpts and email them to the Court and

5    to Defense Counsel.

6         **THE COURT:**  All right.

7         **MS. SEIDEN:**  If the Court would like me to do that.

8         **THE COURT:**  All right.  I -- well, I'll let you

9    finish your argument and then I'm going to hear from

10   Mr. Goldman.

11        So the portions that you just referenced have not

12   been produced to Mr. Goldman.  Is that correct?

13        **MS. SEIDEN:**  They have not, Your Honor, and there are

14   in response to the argument that was just made which is why

15   they were not provided earlier.

16        Beyond that, Your Honor, I'm not sure how Defendant

17   can argue that the information that was passed was readily

18   available to the public.  As the Court and Mr. Goldman pointed

19   out, Defendant has not seen the documents yet that were

20   provided to the IO.  And beyond that, what he overlooked is

21   that the documents passed here were all marked CIU which means

22   that they were not something that was publicly available or

23   free to be passed.

24        He also passed operational orders, that's Overt Act 6

25   which were not publicly available, Your Honor.  And he also

1   took photographs of blueprints and electrical systems for a

2   radar system, and Mr. Goldman failed to mention that those were

3   also not publicly available.

4            And beyond that, Your Honor, in Overt Act 13, we see

5   that he was directed to send information that was marked "CUI"

6   or higher.  And so this is not an instance of Defendant going

7   online and Googling things or sending things that have no

8   significance whatsoever.  He was specifically being tasked with

9   selecting documents that had a certain level of security around

10  them.  And he sent 16 files after that and that is Overt Act

11  16, I believe, Your Honor, and those too are not contained in

12  that binder that we were just provided -- or I suspect they

13  weren't.  I have not had a time to fully look through the

14  binder.

15           Mr. Goldman also said that we shouldn't assume that

16  Defendant is a flight risk because he has family in the PRC and

17  I absolutely agree with that, Your Honor.  Standing alone,

18  somebody having family oversees of course does not make them a

19  flight risk but having family in the PRC, having a

20  sophisticated IO contact in the PRC in conjunction with all of

21  the factors that the Court has already mentioned and the

22  charged conduct here, absolutely does make somebody a flight

23  risk.

24           As to the tickets, Your Honor, I don't know whether

25  it is true or not that Defendant and his wife had actually

28

1   purchased tickets to go to Wisconsin.  That is the first I've

2   heard of it but what is true is that he was for whatever

3   reason, looking up one-way tickets to Taipei.  And whether or

4   not that is an ally of the United States, the point is that it

5   is overseas, it is not consistent with what he represented to

6   the military about his leave.  And as the Court pointed out,

7   it's very concerning in conjunction with $20,000 in a grocery

8   bag in his van.  And I think it underscores, Your Honor, that

9   even if we take his passport, even if we impose conditions to

10  hope that he doesn't flee, if he does flee, we're not getting

11  him back.

12          I think that's -- those are all the points I wanted

13  to hit, Your Honor, so I can make those excerpts for the Court

14  and for Defense Counsel if you would like me to.

15          **THE COURT:**  Yes, please.

16          **MS. SEIDEN:**  Thank you.

17          **THE COURT:**  All right.  The Government is going to

18  make those excerpts and I'd like you to provide those to

19  Mr. Goldman.  I'd like to give Mr. Goldman an opportunity to

20  review them and to make any argument with regard to those

21  excerpts that he would like, as well as respond to anything

22  else that the Government has just stated.

23          **MR. GOLDMAN:**  Your Honor, if I just may speak with

24  respect to the excerpts.

25          As the Court knows, there are times when you do not

1  have the full interview and things can be taken out of context.

2  It's like I explained to the Court in terms of this interview

3  that Mr. Zhao gave regarding using his cousin's ID so they

4  could order products from AliExpress.  If I hadn't seen that, I

5  wouldn't have been able to point out to the Court that that was

6  the basis for using his cousin's ID.  So frankly, Your Honor,

7  unless I have the entire transcript of the interview, I can't

8  really speak -- I can't speak to the interview in its totality

9  and so I'm concerned about that.

10         Certainly, the Government knew that we had a hearing

11  today.  Certainly the Government had an opportunity to provide

12  me with this information ahead of time.

13         And so I would ask this Court to fashion conditions

14  of release for Mr. Zhao so that he can be out of custody.  I

15  think that there are adequate sureties.  I think that there is

16  no indication that he's going to flee, and so I'd ask this

17  Court to grant him bond.

18         **THE COURT:**  Well Mr. Goldman, the Government has

19  proffered some additional information regarding the interview

20  that goes directly to one of your arguments.  And so I think in

21  -- I would like to give you the opportunity to review that

22  portion of the excerpt -- or that excerpt, I should say.

23         Let me ask the Government.  Is it feasible to just

24  provide the entire transcript at this point to the Defense?

25         **MS. SEIDEN:**  Your Honor, it's feasible to show it to

30

1    Defense.  Without a protective order in place, I feel concerned

2    about providing the entire 130-page transcript over at this

3    moment, without having the opportunity to comb it to make sure

4    that there is nothing in it that would be sensitive, which I

5    believe there is.

6         **THE COURT:**  All right.  But absent having the Defense

7    having an opportunity to review the excerpts and the context, I

8    am going to interpret that as the Defense rejecting that

9    proffer.  So I'm not going to consider that in making this

10   decision.

11        If the Government's position is that the Court should

12   consider it, then the Government needs to provide the excerpts

13   with sufficient context so that Mr. Goldman has the opportunity

14   to fairly review them and respond.

15        **MS. SEIDEN:**  I understand, Your Honor, and that's why

16   the Government provided four pages of the last transcript

17   excerpt when it was really relying on about two lines so that

18   he had that opportunity.  So I'm happy to provide a few pages

19   on either end of the very narrow points for which I would be

20   proffering it, which is simply that Defendant knew that this

21   contact resided in the PRC and that he had received training on

22   these topics and that he believed that the contact was

23   suspicious.  So those are the three narrow points and I'm happy

24   to provide sufficient pages on either end.  And again, this is

25   if this is information that the Court believes is relevant to

1    its determination  ---

2         **THE COURT:**  It is relevant.  All right.  I'll have

3    you go ahead and provide that.

4         **MS. SEIDEN:**  Thank you.

5         **MR. GOLDMAN:**  And Your Honor, again, I don't hear any

6    indication from the Government that Mr. Zhao knew that this

7    contact was an agent of the People's Republic of China.

8    There's nothing in the indictment; and frankly, I haven't heard

9    anything that the Government has said regarding Mr. Zhao's

10   knowledge, other than it seemed suspicious.  But there's

11   nothing to indicate that he knew who he was dealing with was an

12   agent of the PRC and I think that's important for the Court to

13   consider.

14        **THE COURT:**  All right.  I'm going to give the

15   Government a moment to transmit it and for you to take a look

16   at the transcripts.

17       (Pause)

18         And counsel, you'll also need to submit those to the

19   Court.

20        **MS. SEIDEN:**  Of course, Your Honor.

21       (Pause)

22        **THE COURT:**  All right.  And Counsel, when you provide

23   those to my courtroom deputy, she has graciously agreed to

24   print those.

25        **MS. SEIDEN:**  Thank you very much.

1        **(Pause in proceeding from 11:24:56 to 11:40:11)**

2            **THE COURT:**  All right.  Counsel, the Court has

3    received pages 16, 17, 18, 31, 32 and 99 and 100 of the

4    transcript of the Defendant's mirandized interview with law

5    enforcement.

6            Is that the entire set of materials that the

7    Government intends to submit?

8            **MS. SEIDEN:**  Yes, thank you, Your Honor.

9            **THE COURT:**  All right.  Mr. Goldman, did you receive

10   those pages?

11           **MR. GOLDMAN:**  I did, Your Honor, and I've read them.

12           **THE COURT:**  All right.  I'll hear any further

13   argument that you have pertaining to those pages or anything

14   else that's been mentioned.

15           **MR. GOLDMAN:**  Thank you, Your Honor.

16           Your Honor, I have read these pages; and frankly,

17   Your Honor, it asserts -- excuse me.  The Government is

18   asserting that somehow Mr. Zhao knew that this guy was involved

19   with the People's Republic of China and that's not my

20   interpretation of it at all.

21           As I previously stated to the Court, Overt Act

22   Number 5 in the prosecution's indictment, talks about Mr. Zhao

23   being involved in investment decisions and he was providing

24   information to Conspirator A to inform investment decisions.

25   And when I read this transcript, it appears that that is

33

1    exactly what Mr. Zhao is talking about, that he's talking about

2    being involved in stocks and investing, and he thinks that this

3    gentleman who he is speaking to is also involved in investing.

4          And with respect to was it suspicious?  He said,

5    "Well, I thought it was suspicious and I tried to cut off all

6    contacts with the guy."  But there is nothing in this

7    transcript, nor in the indictment, that the prosecution has

8    alleged that Mr. Zhao knew he was giving information to an

9    agent of the People's Republic of China.  And it supports my

10    contention that he thinks he's dealing with someone in the

11    investment industry.

12          But there's something else that I think is important

13    to point out to the Court.

14          In the initial Pretrial Services Report, on page 5,

15    the Pretrial Services officer speaks with the navy and it says:

16          "If released, the Defendant can report to work;

17          however, most of his access will be deactivated and

18          they will need to create another job for him."

19          So the navy's not saying this guy is a risk to the

20    navy, a risk to the country.  They're saying, if the Court

21    releases him, he can go back to work.  If he was such a danger,

22    Your Honor, the navy would say, under no circumstances can he

23    go back to work.  So again, it supports my contention that he

24    does not indicate to be a threat to the community, a threat to

25    the navy, or a risk of flight.

34

1          And based on that, Your Honor, I would submit.

2          **THE COURT:** All right.  Thank you, Counsel.

3          **MR. GOLDMAN:** And there's just one other thing --

4     actually there was one other thing.

5          There's a reason for Federal Rule of Evidence 106.

6     It's so that when the Government gives a document, they're not

7     cherry-picking things.  There is a reason for the rule of

8     completeness so we get to see everything and we're not arguing

9     in a vacuum or arguing in things that the Government is cherry-

10    picking.  And we don't have that entire statement.  I'm not

11    sure why we're not entitled to Mr. Zhao's complete statement.

12    He's our client, he's my client.  I should be entitled to his

13    entire statement.

14         So again, Your Honor, there's a reason for Rule 106

15    so that I'm not stuck addressing certain points when I don't

16    have an entire document in order to make an informed argument

17    and a complete argument.

18         **THE COURT:** All right.  Mr. Goldman, I asked for the

19    portions of the transcript.  Obviously Rule 106 is a rule of

20    evidence which doesn't apply in a detention hearing.  And you

21    certainly are entitled, and I'm sure will receive in discovery,

22    the transcript of the entire interview.

23         The Government proffered portions of this and I asked

24    the Government to provide the excerpts to be sure that you had

25    in front of you those pages so that you could address it and I

1  think you have.

2          Is there anything further from the Government?

3          **MS. SEIDEN:**  Very briefly, Your Honor.

4          I just want to be clear because of what Defense

5  Counsel just stated, that the Government's position with

6  respect to these excerpts is clear.

7          The Government is not offering these excerpts, as

8  Mr. Goldman just stated, to indicate or suggest to the Court or

9  state affirmatively the Government's position on whether

10 Defendant knew or did not know that this was an intelligence

11 officer.  What the Government put forward these excerpts for is

12 exactly what I previously stated which is that he knew that

13 this was someone overseas, he knew it was suspicious, he felt

14 that it was suspicious, he had been trained on suspicious

15 context but he did it anyway and he did it because he was

16 getting paid.  And in his own words, he was willing to do

17 whatever the IO said because he was getting paid.  So that is

18 why the Government is putting forward these excerpts.  In other

19 words, Your Honor, he knew better.

20         And as for the navy point, Your Honor, I had the same

21 reaction, candidly, to seeing that in the report and I did

22 speak with NCIS about it.  And the reason that the navy would

23 require him to continue reporting, my understanding from NCIS

24 is as a means of keeping an eye on him, Your Honor, and as a

25 means of making sure that he is staying in line in the event

36

1    that he is released.  But it is not the navy's position that he

2    does not pose a threat.  His security clearance is in the

3    process of being revoked, as is his wife's, so that is not the

4    navy's position and I just wanted the Court to know that.

5            **THE COURT:**  All right.  Thank you, Counsel.

6            All right.  Is there anything further from the

7    Defense?

8            **MR. GOLDMAN:**  No, Your Honor.

9            **THE COURT:**  All right.  Thank you.

10           All right.  Thank you counsel for the detailed and

11   fine arguments.

12           As I said, I've considered all of the -- I've

13   considered all of the arguments of counsel, all of the

14   information proffered by the Government, both Pretrial Services

15   Reports and Recommendations, as well as the indictment.

16           First, the Government has established that it is

17   entitled to a detention hearing under 18 USC Section 3142(f)

18   based on a serious risk of flight so ...

19           And secondly, counsel both make very fine arguments

20   weighing all of the factors.  And obviously, the weight of the

21   allegations is the -- to be given the least -- the strength of

22   the allegations is to be given the least weight.

23           But based on the information that has been provided,

24   the Government has shown that the Defendant presents both a

25   significant risk of flight and a danger to the community.  And

37

1    I find that there is no condition or combination of conditions

2    that will reasonably assure either his appearance or the safety

3    of the community.

4            And I have given great consideration to the

5    significant bond proposed by the Defense; however, the --

6    despite the support, financial and otherwise from his family,

7    which is amply evidenced in the Pretrial Services Report dated

8    today, based on the Defendant's admissions and the allegations

9    in the indictment, the Defendant felt the need to obtain money,

10   frequent payments over a course of an extensive period of time

11   between August of 2021 and May of 2023, from payments which the

12   most generous interpretation is that he was receiving the

13   payments from someone who he knew was located in the People's

14   Republic of China, someone who had instructed him to

15   surreptitiously gather information and at whose direction the

16   Defendant engaged, according to the allegations in the

17   indictment, in numerous activities that he clearly had been

18   trained not to engage in and knew not to engage in.  And

19   apparently, based on receipt of money, decided to do it anyway.

20   Even if he thought it was someone who was investing, it was

21   behavior that was clearly in violation of the oath he took as

22   an officer in the United States Navy.

23           And given his cavalier disregard for that oath, based

24   on these allegations, the Court does not have confidence that

25   he would abide by conditions of release, even if those

38

 1   conditions included a bond secured by property for which his

 2   parents appear to have worked very hard to acquire and

 3   maintain.

 4           With regard to dangerousness to the community, there

 5   is clearly no dangerousness based on substance abuse.  That is

 6   evident from the Pretrial Services Report.  The danger is based

 7   on the allegations set forth in the indictment.  Even if the

 8   Defendant did not know that the individual to whom he was

 9   surreptitiously and continuously transmitting this information

10   was employed by or acquiring the information as part of the --

11   on behalf of the Government of the People's Republic of China,

12   the Defendant was nonetheless clearly willing to, based on

13   these allegations, violate his oath to the navy and send

14   significant information, at least based on the information in

15   the indictment, certainly not all of which appears to be public

16   and which appears to have been clearly labeled as not to be

17   disseminated to the public.  That is endangers the national

18   security of the United States when someone with the U.S.

19   military violates that oath and engages in this conduct.  And I

20   recognize that these are allegations but they are very serious

21   and detailed allegations.

22           So for all of these reasons and based on all of the

23   information provided, the Defendant is ordered detained, both

24   on grounds of flight risk and danger to the community pending

25   the trial in this matter.

39

1          And I believe the matter is already -- and we've

2    already had arraignment and it's before District Judge Klausner

3    so I don't believe that there are any further dates that need

4    to be set.

5          All right.  Are there any questions from the

6    Government?

7          **MS. SEIDEN:**  No, thank you, Your Honor.

8          **THE COURT:**  All right.  From the Defense?

9          **MR. GOLDMAN:**  No, Your Honor.

10         **THE COURT:**  All right.  Thank you counsel.

11         **THE CLERK:**  Court is adjourned.

12      **(Proceeding adjourned at 11:54 a.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

40

## <u>CERTIFICATION</u>

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>August 23, 2023</u>

           Signed                                              Dated


_TONI HUDSON, TRANSCRIBER_

## Exhibit B

# Filed Under Seal